Paul A. Grammatico (SBN 246380)
pgrammatico@kcozlaw.com
**KABAT CHAPMAN & OZMER LLP**
333 S. Grand Avenue, Suite 2225
Los Angeles, California 90071
Telephone:   (213) 493-3988
Facsimile:    (404) 400-7333

Benjamin D. Williams (SBN 307073)
bwilliams@kcozlaw.com
**KABAT CHAPMAN & OZMER LLP**
171 17th Street NW, Suite 1550
Atlanta, GA 30363
Telephone:   (404) 400-7300
Facsimile:    (404) 400-7333

*Counsel for Plaintiffs Daniel S. Gladstone
and Longeviti Health, LLC*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL S. GLADSTONE, an individual, and LONGEVITI HEALTH, LLC, a Florida limited liability company,<br><br>Plaintiffs.<br><br>v.<br><br>MATTHEW A. JACOBSON, an individual, and SIGNATURE MD, INC., a California corporation,<br><br>Defendants. | Case No. 2:22-cv-00775<br><br>**COMPLAINT FOR:**<br><br>(1) Malicious Prosecution;<br><br>(2) Abuse of Process;<br><br>(3) Violations of California Business and Professions Code § 17200, et seq., for Acts of Abuse of Process; and<br><br>(4) Violation of Section 2 of the Sherman Antitrust Act.<br><br>JURY TRIAL DEMANDED |

Plaintiffs Daniel S. Gladstone ("Gladstone") and Longeviti Health, LLC ("Longeviti") (collectively "Plaintiffs") hereby bring this Complaint against Defendants Matthew A. Jacobson ("Jacobson") and Signature MD, Inc. ("SignatureMD") (collectively "Defendants"), alleging as follows:

## **NATURE OF THE ACTION**

1. This case arises from the abusive, admittedly meritless class action lawsuit, styled *Lawrence A. May, M.D. v. Daniel S. Gladstone and Longeviti Health, LLC*, Case No. 2:21-cv-02312, filed in this district on March 16, 2021 ("2021 Class Action"). Put simply, Defendants filed the 2021 Class Action not to vindicate any legitimate harm suffered by the named plaintiff, but in attempt to drive Plaintiff Longeviti, SignatureMD's fledgling competitor, out of business to acquire monopoly power in concierge medicine support services in the United States.

2. Though Defendants' conduct in the 2021 Class Action is the basis for the instant litigation, it's not the first time Jacobson, CEO of SignatureMD, has used his company and position to take out his personal vendetta against Plaintiff Gladstone, Longeviti's CEO. For example, while Gladstone worked for Jacobson at SignatureMD from mid-April 2010 through May 2014, Jacobson subjected him to relentless sexual harassment. In 2018, just a few months after Gladstone formed Longeviti after waiting out his non-compete agreement with SignatureMD by an extra two years, Jacobson sued him in California state court for purportedly stealing confidential information from the company, a baseless allegation Jacobson has never substantiated after many years of litigation. More recently, in January 2021, SignatureMD, still driven by Jacobson's personal vendetta against Gladstone, brought a JAMS arbitration against Plaintiffs per the parties' agreement to arbitrate all disputes arising out of the settlement agreement for the 2018 litigation, again alleging that Plaintiffs purportedly misused SignatureMD's confidential information to unfairly compete.

3. The 2021 Class Action, which forms the basis of this lawsuit, is merely Jacobson's latest attempt to destroy his fledgling rival, and it is egregious. Just over two months after bringing the JAMS arbitration proceeding against Plaintiffs, and to circumvent the parties' arbitration agreement such that Jacobson could crush Plaintiffs with litigation expenses, SignatureMD and Jacobson recruited a straw man plaintiff on SignatureMD's payroll, Lawrence A. May, M.D. ("Dr. May"). Jacobson and SignatureMD then directed Dr. May, who was being paid monthly by SignatureMD, to bring a federal consumer class action in his own name against Plaintiffs. In that case, Dr. May advanced the same baseless allegations and claims SignatureMD and Jacobson brought in their arbitration proceeding and were precluded by the arbitration provision from bringing in federal court.

4. Though Jacobson and SignatureMD did not disclose any of this when the 2021 Class Action was filed, Dr. May's deposition testimony confirmed it all. Dr. May testified that SignatureMD and Jacobson masterminded the 2021 Class Action and continued to control it from the shadows, asking Dr. May to pursue claims he otherwise had no intention of pursuing, choosing May's lawyers for him, paying Dr. May's lawyers on an hourly basis to prosecute the 2021 Class Action, and even producing evidence on Dr. May's behalf, some of which Dr. May had never even seen before his deposition. Even though SignatureMD and Jacobson were not parties to the 2021 Class Action, they continued to act behind the scenes, apparently working directly with the lawyers they chose for Dr. May, all the while prosecuting the same claims in their arbitration proceeding.

5. By forcing Plaintiffs to defend themselves against the same false claims and allegations across two different fronts—thereby pummeling them with crippling litigation expenses—Defendants illegally attempted to drive Plaintiffs out of the concierge medicine support services market altogether, so that SignatureMD could eliminate a formidable competitor that offers better services at

1  lower prices.  Defendants also sought to abuse the class action and discovery
2  mechanisms to exponentially increase Plaintiffs' defense costs and obtain
3  Longeviti's confidential and proprietary information, hoping to eliminate
4  Longeviti's ability to effectively compete in the market.

5       6.     This kind of anticompetitive behavior is particularly egregious
6  because it causes exactly the type of harm the antitrust laws were meant to
7  prevent—driving a new market entrant out of the marketplace and thereby
8  eliminating competition.  "Large companies can impose ruinous legal costs on
9  their smaller competitors by forcing them to defend against a lawsuit."  Litigation
10  As a Predatory Practice: Hearing Before the Subcomm. on Intell. Prop.,
11  Competition, and the Internet, 112 Congress 1 (Feb. 17, 2012) (Opening
12  Statement of Rep. Bob Goodlatte).  "A predatory plaintiff controls the scope of the
13  claims in the suit, and so has the ability to structure its claims and discovery
14  requests in a way that maximizes costs for the defendant. And the costs of
15  litigation weigh much heavier on a small business then a large corporation."  *Id.*
16  "For all these reasons, litigation can be a particularly effective predatory strategy.
17  Deployed strategically, litigation can put a competitor out of business, prevent a
18  competitor from ever entering the market, or force a competitor to reduce its
19  output."  *Id.*  "If a big company succeeds in using litigation to limit competition,
20  then there is a dangerous probability that it could profit by raising prices on
21  consumers."  *Id.*

22       7.     Given Defendants' abusive litigation tactics in the 2021 Class Action,
23  Plaintiffs preemptively moved to deny class certification and for sanctions.  The
24  court denied certification, noting it was "troubled" by Defendants' actions but did
25  not have enough information at the time to award the sanctions Plaintiffs
26  requested.  Dr. May and his counsel thereafter dismissed the case *with prejudice*,
27  realizing they might be sanctioned if they continued to pursue it.

28       8.     As a direct and proximate result of Defendants' anticompetitive

conduct, Plaintiffs were forced to expend a significant amount of time and money in defending objectively meritless claims filed in the 2021 Class Action and suffered significant harm to their reputation and business interests.

9.     In response to Defendants' unlawful conduct, Plaintiffs were forced to file this lawsuit, seeking compensatory and punitive damages, pre-judgment interest, injunctive relief enjoining Defendants from further harassing Plaintiffs with the unfair and unlawful anticompetitive practices described herein, and declaratory relief holding that Defendants' conduct constitutes unfair competition.

## PARTIES

10.     Gladstone is an individual who resides in the State of Florida.

11.     Longeviti is a limited liability company organized under the laws of the State of Florida with its principal executive office at 2645 Executive Park Drive, Weston, Florida 33331.

12.     Jacobson is an individual who resides in Los Angeles, California.

13.     SignatureMD is a corporation organized under the laws of the State of California with its principal executive office at 2633 Lincoln Boulevard, Suite 838, Santa Monica, California 90405.

14.     SignatureMD's registered agent is Michael Rhind, 2633 Lincoln Boulevard, Suite 838, Santa Monica, California 90405.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as this case involves questions of federal law.  The Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy under Article III of the United States Constitution.  Plaintiffs' state law claims arise out of a common nucleus of operative facts with their federal law claims such that the adjudication of Plaintiffs' state law claims with their federal claim furthers the interest of judicial economy, convenience, consistency, and

fairness to the parties.

16.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity of citizenship between the parties (Florida and California) and the amount in controversy exceeds $75,000. Specifically, Plaintiffs seek to recover, among other things, from Defendants their attorneys' fees and costs for defending the frivolous federal lawsuit, which alone totaled more than $75,000.  In addition, Plaintiffs seeks to recover for the damage to their business reputation and interests, as well as punitive damages to penalize Defendants for their intentional and malicious misconduct.  The combined value of the damages Plaintiffs seek far exceeds $75,000.

17.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because all or a part of the events giving rise to the causes of action asserted by Plaintiffs took place in this district, and because all Defendants reside in this district.

## COMMON FACTUAL ALLEGATIONS

### Longeviti and SignatureMD Directly Compete in Concierge Medicine Support Services

18.     Longeviti and SignatureMD directly compete to provide concierge medicine support services in the United States.

19.     Longeviti is a concierge medicine support services provider that connects physicians with patients to deliver high-quality, end-to-end personalized medical care through a care delivery model that allows physicians to spend far more time with patients than in typical health care systems.

20.     Founded by Plaintiff Gladstone in December 2017, Longeviti is a relatively new entrant in the market for concierge medicine support services. Since then, Longeviti has worked tirelessly to build its business into the best, most effective, and most responsive concierge medicine support services provider in the market.

21.  Longeviti has always grown organically; it has never acquired a competitor for the sake of growth.

22.  SignatureMD offers similar services: it delivers "membership-based concierge medicine support service to concierge physicians," and "connects patient members with physicians."  SignatureMD's CEO, Matt Jacobson, founded SignatureMD in 2006.

23.  SignatureMD currently has a network of around 300 affiliated physicians and is the second largest provider of concierge medicine support services in the United States.

24.  SignatureMD relies on acquisition and venture capital funding strategies to grow rapidly, and has recently acquired two competitors.

**The Relevant Concierge Medicine Support Services Markets**

25.  The relevant product and geographic markets are those for concierge medicine support services to (a) *established* concierge physicians, who have already joined the concierge services market, and (b) *prospective* concierge medicine physicians, in the United States.

26.  Upon information and belief there are currently no less than 1,500 established concierge medicine physicians nationwide.

27.  Longeviti is one of the lowest cost support services providers in the established concierge medicine physician market.

28.  Longeviti offers an unparalleled customized experience in both concierge medicine physician markets.  For example, Longeviti meets with each physician one on one to develop a customized business plan, offers physicians the ability to specialize in a specific sub-area within their practice (*e.g.*, a general practitioner can focus on sexual dysfunction or aging, etc.), and sets them up to focus on their practice in a way that ultimately benefits the consumer.

**Jacobson's Abusive History Toward Gladstone**

29.  Gladstone worked for Jacobson at SignatureMD from mid-April

2010 to the end of May 2014.

30.     Jacobson and Gladstone's relationship soured during Gladstone's employment after several of SignatureMD's investors and advisors gave Gladstone credit during a venture capital encounter for growing SignatureMD's business that had earned SignatureMD $20 million in revenue.  Though Gladstone was on Jacobson's team, Jacobson's ego could not withstand the prospect that anyone else but himself would be given any credit for SignatureMD's growth.

31.     Jacobson also became increasingly jealous of Gladstone's social and financial success, and started taking his jealously out on Gladstone in employee and client meetings.

32.     For example, Jacobson renegotiated Gladstone's sales goals and commissions structures believing that Gladstone would not be able to hit his bonuses.  When Gladstone exceeded those numbers (making Jacobson rich in the process), Jacobson only resented Gladstone more for "earning too much," especially given Gladstone's young age.

33.     Jacobson repeatedly attempted to sexually embarrass and harass Gladstone in employee and client meetings.  For example:

> a. Jacobson often encouraged co-workers and prospective clients to search for pictures of Gladstone online from his prior underwear modeling career.
>
> b. Jacobson forced Gladstone to send a giant cardboard cutout of Gladstone modeling underwear to a gay, male physician prospect.
>
> c. Jacobson made highly offensive and sexually taunting remarks to and about Gladstone in the office and in sales meetings.
>
> d. Jacobson repeatedly told Gladstone he should sexually please openly gay male doctors to win their business.
>
> e. Jacobson intimidated and bullied Gladstone into putting off a necessary spinal fusion surgery for his broken back.

COMPLAINT

34.     When Gladstone approached Jacobson about working from home to avoid the harassment, Jacobson retaliated by threatening to reduce Gladstone's salary by 33% and then terminated Gladstone's employment in May 2014 when he objected to the reduced salary.

35.     Thereafter, SignatureMD refused to purchase Gladstone's 14,000 shares of common stock in the company—until Gladstone filed a charge of sex discrimination with the EEOC against SignatureMD based on Jacobson's sexual harassment in August 2014.   In exchange for Gladstone withdrawing his discrimination charge, and after extensive negotiation, SignatureMD and Gladstone entered a release and separation agreement, executed in January 2015. The release and separation agreement provided that Gladstone's 14,000 shares of SignatureMD's common stock were deemed fully vested, and required SignatureMD to purchase these shares for a total of $150,000 in three payments of $50,000 each made over a 60-day period.  The release and separation agreement further permitted Gladstone to exercise the option to have SignatureMD purchase his 8,199 shares of phantom stock in the future, at the then-current market value.

36.     When Gladstone exercised his option for SignatureMD to purchase his 8,199 shares of phantom stock in March 2018 at the then-current market value, upon information and belief, Jacobson intentionally adjusted the valuation of SignatureMD's stock in order to reduce Gladstone's payout and decrease the value of the company during Jacobson's divorce proceedings.  SignatureMD provided Gladstone a draft valuation of the shares, which assumed the current market value had not changed in four years, despite the company having grown by approximately 50%.  SignatureMD delayed getting a final valuation of the shares so long that Gladstone eventually accepted the draft valuation because he needed the funds to survive given his non-compete and back surgery, facts that Jacobson knew and took advantage of.

37.     Gladstone waited an additional two years beyond his twelve-month

1  non-compete agreement after being terminated in May 2014 before forming
2  Longeviti in December 2017.

3  **SignatureMD's Abusive History Against Gladstone**

4        38.    Nevertheless, in the spring of 2018, just a few months after Gladstone
5  founded Longeviti, SignatureMD, fueled by Jacobson's personal hatred of
6  Gladstone, sued Gladstone in California state court.  In that case, SignatureMD
7  brought various claims, such as unfair competition and intentional interference
8  with prospective economic relations, and falsely alleged that Gladstone retained
9  SignatureMD's confidential information to unfairly compete.   SignatureMD's
10 2018 lawsuit was entirely meritless and nothing more than a public smear
11 campaign against Gladstone and his company, borne out of Jacobson's enmity and
12 jealousy.

13       39.    In response, Gladstone filed a cross-complaint against SignatureMD,
14 bringing claims of reformation of his employment release and separation
15 agreement, breach of contract, and fraud in the inducement, among others.
16 Gladstone sought reformation of his separation agreement to include a mutual
17 non-disparagement clause the parties had agreed to, and which was omitted when
18 the parties executed a prior version of the separation agreement by mistake.

19       40.    In October 2018, SignatureMD and Gladstone reached a settlement
20 agreement following a mediation requested by SignatureMD in which they agreed
21 to dismiss their claims against one another and mutually release all claims whether
22 "known or unknown, matured or unmatured, foreseeable or unforeseeable, which
23 any Party now has, ever had, or may have had prior to signing this Settlement
24 Agreement, . . . arising out of or pertaining in any way" to the 2018 litigation and
25 Gladstone's employment with SignatureMD.  In consideration of the release,
26 Gladstone agreed he would not "tortiously interfere with [SignatureMD] and its
27 business operations."  Both parties paid their own attorneys' fees and costs, and
28 neither paid the other any money to resolve the dispute.  As part of the settlement

agreement, Gladstone and SignatureMD agreed to arbitrate "any dispute arising with respect to the rights or obligations of the Parties under this Settlement Agreement or any claim of breach of those rights."  Settlement Agreement § 12. They also entered a covenant not to sue, as follows:

> Covenant Not to Sue.  The Parties hereby irrevocably covenant to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind against the other Party or his or her, assignees, attorneys, representatives, affiliates, agents, servants, successors, administrators, accountants, and any and all other related individuals and entities based upon any of the claims released in this Settlement Agreement.

*Id.* § 4(b).

41.    Thus, under the agreement to arbitrate, SignatureMD and Jacobson are precluded from suing Plaintiffs based on any claim that it brought in its 2018 complaint.  In other words, the agreement to arbitrate contained in the mediation settlement agreement precludes SignatureMD and Jacobson from suing Gladstone in federal court for any claim that Gladstone retained SignatureMD's confidential information to unfairly compete.

42.    Nevertheless, in January 2021, SignatureMD, driven by Jacobson's personal vendetta against Gladstone, brought a JAMS arbitration against Plaintiffs per the agreement to arbitrate, *again* alleging that Plaintiffs purportedly misused SignatureMD's confidential information to unfairly compete.  For example, in the arbitration, SignatureMD claims: "Gladstone and Longeviti have (despite denials made as recently as December 2020) used [SignatureMD's] customer lists, contact information, and other data to unfairly compete with SignatureMD."  The arbitration is ongoing.

43.    Defendants and their counsel, Russell F. Wolpert ("Wolpert") of Ellis George Cipollone O'Brien Annaguey LLP, have also continued to belittle and harass Gladstone throughout the arbitration proceedings.  For example, in SignatureMD's responses to Plaintiffs' interrogatories, Wolpert twice referred to

Gladstone as "a male underwear model" to downplay his experience in the healthcare marketing and technology sectors. In relevant part, these responses state, "In truth, Gladstone was a male underwear model whose first job in anything related to concierge medicine – or anything medical-related – was a brief stint at a company called MDVIP, Inc., where Gladstone separated from employment after less than half a year."

44.    SignatureMD and Wolpert have improperly attempted to use discovery in the arbitration to glean Longeviti's trade secrets and other information about the innerworkings of its business, including, but not limited to: the names of all Longeviti's current and prospective clients, its financial arrangements with its current clients, and information about the operations of its Medical Advisory Board. For example, in a letter to the arbitrator seeking permission to depose former members of Longeviti's Medical Advisory Board, Wolpert explains that Defendants seek "the unvarnished truth about this so-called Medical Advisory Board that [Plaintiffs] use to advertise their competitive advantage."

45.    Relatedly, SignatureMD and Wolpert have also improperly sought to increase Plaintiffs' defense costs in the arbitration by serving a slew of third-party subpoenas they have no authority to serve. Under the JAMS arbitration rules, each party is limited to one deposition, and the arbitrator has not excused the parties from this rule. Further, the third-party subpoenas are unenforceable in arbitration under binding Ninth Circuit and California Court of Appeals authority. Wolpert also communicated directly with Longeviti's client-physicians and related individuals without copying Plaintiffs' counsel or confirming whether Plaintiffs' counsel would be representing the subpoenaed individuals with respect to the deposition subpoenas, both of which are patently improper.

46.    Additionally, after deposing Longeviti's CEO, Gladstone, Wolpert has now refused to produce SignatureMD's CEO, Jacobson, for deposition.

**SignatureMD and Jacobson Cause Dr. May to Bring a Sham Lawsuit**

47.    To circumvent their obligation to arbitrate all disputes arising out of the settlement agreement and in a further attempt to crush Plaintiffs with litigation expenses and drive them out of business, SignatureMD and Jacobson recruited Dr. May—a SignatureMD executive—to file yet another baseless lawsuit against Plaintiffs.

48.    Just over two months after bringing the JAMS arbitration proceeding against Plaintiffs, in March 2021 SignatureMD and Jacobson caused Defendant Dr. May to sue Plaintiffs in a court in this district, advancing the same baseless allegations and claims they brought in their arbitration proceeding.  For example, in the 2021 Class Action, Defendants caused to be falsely alleged:

a.    That Daniel Gladstone "unlawfully retained a copy of SignatureMD's Physician List without its authorization," after Gladstone left SignatureMD in 2014.

b.    That after leaving SignatureMD, Gladstone "gained unauthorized access to SignatureMD's client relationship management system and once again obtain[ed] private contact information of additional physicians."

c.    That Gladstone contacted the physicians on SignatureMD's Physician List via email without providing an option to unsubscribe from future emails.

d.    That based on these and other allegations, SignatureMD, through its medical advisory board chairman, Dr. May, supposedly have claims under the Telephone Consumer Protect Act ("TCPA") and California's Unfair Competition Law ("UCL") (for Longeviti's and Gladstone's supposed unfair and unlawful conduct under the UCL).

49.    The thrust of Dr. May's allegations was that Plaintiffs robo-called and emailed to solicit him to learn more about the concierge medical support services

Longeviti provides, after stealing that contact information from SignatureMD.

50.     Based on these allegations, Dr. May sought to represent a broadly defined nationwide (though non-existent) class including all "past, current, and potential physicians" who "received an email to their private email address, that references and advertises Longeviti's concierge support services" and/or a robocall without their prior express consent.

51.     Although his complaint did not mention it, Dr. May serves as the chairman of SignatureMD's medical advisory board, a leadership position within SignatureMD that Dr. May has held for approximately four years.

52.     As chairman, Dr. May provides advice to SignatureMD, investigates opportunities for the company, and helps recruit new physicians.  For providing these services, SignatureMD pays Dr. May a $5,000-per-month stipend.

53.     Along with his chairman role, Dr. May is also an affiliate physician of SignatureMD, which means he provides concierge medical services to member-patients through SignatureMD's concierge platform.

54.     SignatureMD helps "recruit and establish the core group of patients" to become members of Dr. May's concierge medicine practice that Dr. May treats, and the company oversees the billing for those member-patients.  SignatureMD bills the member-patients directly, retains its agreed percentage, and pays Dr. May the remainder of the fees collected from the member-patients.

55.     Dr. May revealed in his deposition that it was SignatureMD's founder and CEO's (*i.e.*, Jacobson's) idea, not his, both to file the 2021 Class Action against Longeviti and Gladstone and to have Dr. May serve as lead plaintiff.

56.     Dr. May admitted he never sought legal counsel on his own, and he had never heard of the CAN-SPAM Act, TCPA, or the UCL until he was given a draft of the complaint to review.

57.     Dr. May admitted he had no independent understanding that he might have any legal claims against Longeviti or Gladstone until Jacobson told him he

(supposedly) did.

58.     Dr. May admitted that Jacobson handpicked the lawyers who served as Dr. May's counsel in the 2021 Class Action.

59.     Dr. May admitted that Jacobson gave Dr. May no say in appointing those lawyers.

60.     Dr. May admitted he did not pay the lawyers Jacobson selected for him in the 2021 Class Action.

61.     Instead, SignatureMD paid the lawyers by the hour to prosecute Dr. May's case against Plaintiffs.

62.     While Dr. May has his own personal attorney, he did not speak to that attorney before filing his complaint and instead used the attorneys that Jacobson chose for him.

63.     Dr. May admitted he had no economic damages or any concrete injury arising from Longeviti's or Gladstone's alleged conduct.

64.     SignatureMD and Jacobson's clandestine participation did not end with merely orchestrating the 2021 Class Action, asking Dr. May to pursue claims he had no intention of pursuing, or choosing May's lawyers for him.

65.     SignatureMD and/or Jacobson also produced documents on Dr. May's behalf that misleadingly appeared to come from Dr. May's files, but at least some of those documents were never in Dr. May's possession, custody, or control.

66.     Dr. May had not even seen some of the documents produced in the 2021 Class Action until his deposition.

67.     Jacobson and/or SignatureMD gave Dr. May's attorneys those documents directly, to produce in the litigation, with a Bates stamp bearing Dr. May's name.

68.     Even though SignatureMD and Jacobson were not parties to the 2021 Class Action, they continued to act behind the scenes, apparently working directly with the lawyers they chose for Dr. May, to produce potential evidence in the 2021

COMPLAINT

1   Class Action.

2        69.    On information and belief, Dr. May entered into an indemnity

3   agreement with SignatureMD and/or Jacobson with regard to the 2021 Class

4   Action. This indemnity agreement is evidence that Dr. May was aware that the

5   lawsuit was without merit, that it was being controlled by SignatureMD and/or

6   Jacobson (even though he was the Plaintiff) with malicious intent and ulterior

7   motive, and that acting as lead plaintiff in a class action he knew almost nothing

8   about posed significant personal liability to himself.

9        70.    On information and belief, Dr. May's attorneys also entered into an

10  indemnity agreement with SignatureMD and/or Jacobson with regard to the 2021

11  Class Action, evidencing that the attorneys knew the case had no merit and was

12  being controlled by SignatureMD and/or Jacobson (even though Dr. May was the

13  named Plaintiff) with malicious intent and ulterior motive.

14       71.    Based on Jacobson's reckless personal crusade in bringing baseless

15  litigation against Gladstone, irrespective of the interests of SignatureMD, a

16  conflict has now arisen between SignatureMD and Jacobson.

17       72.    Indeed, upon information and belief, Jacobson used SignatureMD's

18  coffers—to the detriment of both SignatureMD and its investors—to further his

19  own personal interests in sabotaging Gladstone and has done so without the

20  approval or knowledge of SignatureMD's Board of Directors.

21  **Defendants' Damaging and False Allegations in the 2021 Class Action**

22       73.    In the complaint in the 2021 Class Action, Defendants caused to be

23  alleged specious and damaging allegations that Dr. May either confirmed were

24  false or that were based on pure speculation untethered to Dr. May's own personal

25  knowledge.

26       74.    For example, the complaint alleged that Plaintiffs' emails to Dr. May

27  violated the CAN-SPAM Act because they did not include a way to opt out of

28  receiving emails from Plaintiffs.

75.     In relevant part, the CAN-SPAM Act requires that marketing emails contain either a return email address or other mechanism to request not to receive future marketing emails from the sender.

76.     Had Dr. May's lawyers bothered to check with their client or undertake a reasonable and competent inquiry into the facts before filing the 2021 Class Action, they would have discovered that the emails to Dr. May indeed had an "unsubscribe" link but that Dr. May never used it—and that he therefore had no UCL claim based on a purported violation of the CAN-SPAM Act.  In fact, the email from Plaintiffs attached as exhibits to Dr. May's complaint even displayed the compliant "unsubscribe" link.

77.     Had Dr. May's lawyers conducted a required reasonable inquiry and represented the interests of their actual client, Dr. May, instead of merely carrying out Jacobson's tortious directions, they also would have discovered that Dr. May suffered no economic damages or other harm, which in turn means he lacked standing to bring any of his claims.

78.     The complaint further alleged that Gladstone misappropriated Dr. May's contact information from SignatureMD and used that information to call Dr. May.  It also alleged that Dr. May never supplied his cellphone number to Gladstone and Longeviti.

79.     Again, had Dr. May's lawyers bothered to check with their client or undertake a reasonable and competent inquiry into the facts before filing the 2021 Class Action, they would have learned that Gladstone obtained Dr. May's contact information directly from Dr. May when the two met at a lunch in Calabasas, California, not by stealing it from SignatureMD.

80.     The complaint also alleged that Dr. May received "multiple calls" by a machine that automatically played a pre-recorded voice message when Dr. May answered, but his testimony did not back that up either.  During his deposition, Dr. May only identified a single call from Defendants and could not refute that a live

person called him.

81.    Rather than undertake a reasonable inquiry into the background and facts before filing false allegations and bogus claims, Dr. May's lawyers—acting at the direction of SignatureMD and Jacobson—merely recycled many of the same allegations SignatureMD is already pursuing in the first-filed arbitration.  In other words, in filing and maintaining the 2021 Class Action, Dr. May's lawyers acted primarily for a purpose other than vindicating their client's rights when they followed the instructions of Plaintiffs' direct competitor who funded the 2021 Class Action but did not possess the claims in the 2021 Class Action and, further, was bound by an arbitration provision.

82.    Defendants thus recklessly or knowingly caused to be filed spurious, false, and frivolous claims "without a basis in fact or in law" and pursued these claims via Dr. May on a class-wide basis.

83.    Defendants paid Dr. May's attorneys to prosecute the 2021 Class Action on an hourly basis, rather than on a contingency basis, like all other class action lawsuits, and directed Dr. May's counsel to pursue these baseless claims in such a way as to make Plaintiffs incur considerable expense, including serving class-wide discovery and engaging in other gamesmanship in concert with SignatureMD's counsel in the underlying arbitration.   For example, when Plaintiffs requested SignatureMD's consent to file the arbitration agreement in the 2021 Class Action, SignatureMD's counsel refused, forcing Plaintiffs to not only seek relief from the arbitrator but to file an application for leave to file the arbitration agreement under seal in support of its motion to deny class certification while the arbitrator considered whether the arbitration agreement was confidential. Despite SignatureMD refusing to let Plaintiffs file the arbitration agreement, Dr. May's attorneys then publicly filed the very same agreement in Dr. May's opposition to Plaintiffs' motion.

**Defendants Dismiss the 2021 Class Action with Prejudice**

84.     Given SignatureMD's and Jacobson's abusive and anticompetitive litigation tactics, Plaintiffs preemptively moved to deny class certification and to impose sanctions on Dr. May's attorneys (who were in reality advancing frivolous claims on behalf of Jacobson and SignatureMD that they were themselves barred from pursuing).

85.     On December 22, 2021, the court issue an order granting Plaintiffs' motion to deny class certification because Dr. May was not an adequate representative.

86.     The court thus held that Dr. May and his counsel were inadequate representatives and ordered that the case could only proceed as an individual action.  More specifically, the court explained:

> Jacobson – the CEO of SignatureMD – pays May's legal fees in this litigation against SignatureMD's competitor and former employee. . . . [T]his arrangement raises significant concern as to whether May's counsel is motivated by a desire to zealously represent the putative class, or instead by Jacobson's or SignatureMD's litigation agenda.  This arrangement also raises significant concern about whether Jacobson has or will interfere with the professional judgment of May's counsel.

87.     The court also found the contingency fee arrangement troubling, stating:

> Additionally, May's counsel has not taken the case on a contingency fee basis – an anomaly in class action litigation.  The fee agreement adds to the Court's considerable doubt that May's counsel is independent of Jacobson and – at the very least – gives the appearance that counsel may take actions urged by Jacobson that are inconsistent with the interest of the entire class.

88.     While the court denied Plaintiffs' request for sanctions, it did so without prejudice, noting it was "troubled" by the facts but did not have enough information at that time, so an award of sanctions would be "premature" (as opposed to unwarranted).

89.     Dr. May and his counsel voluntarily agreed to dismiss the 2021 Class Action with prejudice after a call with Plaintiffs' counsel asking how they could possibly continue pursuing the claims, as they were demonstrably false.  For example, the emails that allegedly violated the CAN-SPAM Act attached as exhibits to Dr. May's complaint even displayed the compliant "unsubscribe" link. Dr. May's counsel did not attempt to defend their prosecution of the case, and instead indicated they intended to dismiss it with prejudice, with or without Gladstone's and Longeviti's approval.  Thereafter, Dr. May's counsel filed a stipulation to dismiss with prejudice on January 20, 2022, closing the case.

**Defendants' Ulterior Motive to Drive Longeviti Out of the Marketplace**

90.     The claims and allegations in the federal suit, coupled with Dr. May's stunning admissions, confirm that SignatureMD and Jacobson—using Signature's medical advisory board chairman as their pawn—masterminded the lawsuit and continued to control it from the shadows to circumvent the arbitration provision and to continue to wreak financial havoc on Longeviti (and its young CEO, Gladstone), who compete directly with SignatureMD in the concierge medicine support services market.

91.     Their nefarious goal could not be clearer: by forcing Longeviti and Gladstone to defend themselves against the same claims and allegations across two fronts in two different procedures, thereby crushing them with crippling litigation expenses, SignatureMD and Jacobson attempted to drive Plaintiffs out of the concierge medicine support services market altogether, so that SignatureMD could eliminate a formidable competitor that offers better services at lower prices.

92.     Further illustrating both the meritlessness of, and ulterior motive behind, SignatureMD's duplicative claims, SignatureMD offered to dismiss the arbitration in exchange for Gladstone's agreement not to knowingly solicit, and not to sign up, any of SignatureMD's affiliate physicians for a period of three years. SignatureMD did this because (a) the court's order denying class certification in

the 2021 Class Action ruined Defendants' plan to bankrupt Longeviti with litigation expenses and thereby force it out of the market, and (b) Plaintiffs' counsel had notified Defendants of their intent to seek sanctions against Dr. May and his counsel and to file the instant action.  In other words, after failing to bankrupt Plaintiffs with dual proceedings and now facing a potential lawsuit and/or sanctions motion (which Defendants would be on the hook for given their indemnification agreements with Dr. May and his counsel), Defendants changed their strategy and, instead, sought to hinder Longeviti's ability to compete by offering to dismiss their meritless arbitration in exchange for nothing more than a poorly disguised three-year non-compete agreement.  Putting aside the facts that Gladstone already honored his twelve-month non-compete agreement with SignatureMD and even waited an additional two years before forming Longeviti and that such non-compete agreements are generally unenforceable in the State of California, this "settlement offer" was just another abusive, anti-competitive ploy by Defendants.

93.     Jacobson is a multi-millionaire, has SignatureMD's substantial resources at his disposal, and knows Longeviti is still in startup phase and is easily disrupted by litigation expenses.

94.     SignatureMD's and Jacobson's litigation conduct drained (and continues to drain due to the ongoing arbitration) Plaintiffs' resources by forcing them to defend themselves against overlapping, frivolous claims on more than one front.  To give perspective, the amount Plaintiffs have so far been forced to spend in their defense as a fledgling business is equivalent to Apple spending hundreds of billions of dollars to defend itself in thousands of baseless lawsuits brought by a competitor.

# FIRST CLAIM FOR RELIEF

## (Malicious Prosecution Against All Defendants)

95.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 94 of this Complaint as if fully set forth herein.

96.     The 2021 Class Action was initiated by Dr. May and his counsel at the direction of Defendants.

97.     The 2021 Class Action was continued by or at the direction of Defendants to a legal termination on the merits in favor of Plaintiffs.

98.     Defendants did not have probable cause to file the 2021 Class Action against Plaintiffs.

99.     Defendants knew or reasonably should have known that the claims in the 2021 Class Action were without merit.

100.    Defendants prosecuted the claims after they knew or should have known that those claims had no merit.

101.    In initiating and perpetuating the 2021 Class Action, Defendants acted primarily for a purpose other than succeeding on the merits of the claims. That purpose includes, but is not limited to, harassing Plaintiffs, draining their financial resources to force them out of the marketplace, and eliminating Plaintiffs' ability to effectively compete in the marketplace by obtaining through discovery Plaintiffs' (SignatureMD's competitor) confidential and proprietary information which, it should here be noted, they continue to pursue in the arbitration.

102.    In initiating and continuing the 2021 Class Action, Defendants acted with oppression, fraud, and malice, including, but not limited to, acting with an intent to cause injury to Plaintiffs, and engaging in despicable conduct with a willful and conscious disregard of the rights of others.

103.    Plaintiffs obtained a favorable termination of the 2021 Class Action as to all claims.

104.   As a direct and proximate result of Defendants' conduct, Plaintiffs were forced to expend a significant amount of time and money in defending the meritless claims filed by Defendants.

105.   Further, Plaintiffs suffered significant harm to their reputation and business interests.

106.   This has resulted in harm to Plaintiffs far in excess of $75,000.

107.   The conduct of Defendants, individually and collectively, was a substantial factor and proximate cause in bringing about Plaintiffs' harm.

## SECOND CLAIM FOR RELIEF

### (Abuse of Process Against All Defendants)

108.   Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 107 of this Complaint as if fully set forth herein.

109.   Defendants intentionally and willfully commenced the 2021 Class Action for the improper ulterior purpose to harass Plaintiffs, drain their financial resources to force them out of the marketplace, eliminate Plaintiffs' ability to effectively compete with SignatureMD in the marketplace by obtaining through discovery Plaintiffs' (SignatureMD's competitor) confidential and proprietary information.

110.   In the 2021 Class Action, Defendants improperly used the class action mechanism by selecting and puppeteering a bogus class representative and serving class-wide discovery to significantly increase Plaintiffs' litigation costs in defending baseless claims.

111.   Defendants further improperly used the discovery mechanism to obtain the confidential and proprietary information of its competitor, Longeviti, to effectively destroy its ability to compete in the marketplace, including, but not limited to: the names of all Longeviti's current and prospective clients, the contents of all Longeviti's marketing materials, the various platforms Longeviti uses to market its services, copies of all Longeviti's communications with its

clients, and copies of Longeviti's written marketing policies and practices.

112.   In short, Defendants committed acts of abuse of process by using the class action mechanism to financially destroy its competitor and the discovery mechanism to obtain a behind-the-scenes playbook into its competitor's business.

113.   As a direct and proximate result of Defendants' conduct, Plaintiffs were forced to expend a significant amount of time and money in defending the meritless claims filed on a class-wide basis by Defendants.

114.   Further, Plaintiffs suffered significant harm to their reputation and business interests.

115.   This has resulted in harm to Plaintiffs far in excess of $75,000.

116.   Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

### THIRD CLAIM FOR RELIEF

**(Violations of State Law – California Business and Professions Code § 17200, et seq., for Abuse of Process Against All Defendants)**

117.   Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 116 of this Complaint as if fully set forth herein.

118.   California's Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.*, prohibits any unlawful, unfair, or fraudulent business act or practice.

119.   Defendants have violated the unlawful prong of the UCL by engaging in acts of abuse of process and malicious prosecution.

120.   Defendants have also violated the UCL by engaging in unfair and fraudulent business practices by orchestrating and/or funding a sham class action lawsuit (that they were precluded from bringing) for improper purposes, *i.e.*, to harass Plaintiffs, drain their financial resources to force them out of the marketplace, and eliminate Plaintiffs' ability to effectively compete in the

marketplace by obtaining the confidential and proprietary information of their competitor, Longeviti.

121.   Defendants' unlawful, unfair, and fraudulent conduct damaged Plaintiffs by forcing Plaintiffs to pay to defend themselves against the same frivolous claims and allegations across two different fronts, thereby pummeling them with crippling litigation expenses.

122.   This has resulted in harm to Plaintiffs far in excess of $75,000.

123.   Plaintiffs seek an order (1) enjoining Defendants from further harassing Plaintiffs with such unfair and unlawful practices described herein; and (2) awarding reasonable costs and attorneys' fees pursuant to California Code of Civil Procedure § 1021.5.

124.   Plaintiffs also seek declaratory relief holding that Defendants' conduct constitutes unfair competition, along with such other declaratory, injunctive, or other equitable relief as may be necessary to prevent and remedy such conduct.

## FOURTH CLAIM FOR RELIEF

### (Violations of Section 2 of the Sherman Antitrust Act Against SignatureMD)

125.   Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 124 of this Complaint as if fully set forth herein.

126.   SignatureMD knowingly and intentionally engaged in a course of predatory conduct that included improperly filing and prosecuting objectively baseless claims against Plaintiffs in the 2021 Class Action.

127.   SignatureMD did not file the 2021 Class Action with a good faith belief that Plaintiffs violated the law or with a desire to vindicate the interests of any person allegedly harmed by violation of the law.

128.   By engaging in this anticompetitive conduct, SignatureMD intentionally and wrongfully attempted to acquire monopoly power in the established and prospective concierge medicine physician markets in violation of

Section 2 of the Sherman Act.

129.   SignatureMD engaged in anticompetitive conduct with the specific intent to (a) force Longeviti, a new market entrant, out of business; (b) destroy Longeviti's ability to effectively compete in the market by using the discovery mechanism to obtain Longeviti's confidential and proprietary information; and (c) control or artificially inflate prices in the market by severely wounding or destroying a new-entrant competitor that is one of the lowest cost vendors in the established concierge medicine services physician market and that offers the most bespoke concierge medicine support experience in the concierge medicine services market.

130.   Longeviti being driven out of the concierge medicine services markets would significantly impair the consumer experience by raising prices for concierge medicine services and depriving consumers of Longeviti's uniquely customized experience.

131.   SignatureMD's antitrust violations forced Plaintiffs to pay to defend themselves against the same objectively frivolous claims and allegations in the 2021 Class Action as in the first-filed arbitration, thereby subjecting them to debilitating litigation expenses and causing significant financial harm to Longeviti's fledgling business.

132.   The harm Plaintiffs suffered as a result of SignatureMD's antitrust violations is the kind of harm the antitrust laws were intended to prevent—driving a new market entrant out of the marketplace, eliminating competition, reducing consumer choice, and artificially raising or controlling prices.

133.   As a direct and proximate result of SignatureMD's antitrust violations, Plaintiffs were forced to expend a significant amount of time and money in defending objectively meritless claims filed by SignatureMD in the 2021 Class Action.

134.   Further, Plaintiffs suffered significant harm to their reputation and business interests.

135.   This has resulted in harm to Plaintiffs far in excess of $75,000.

### Prayer for Relief

WHEREFORE, Plaintiffs pray for judgment as follows:

A.   For special damages including attorneys' fees and other costs in defending the 2021 Class Action, damage to reputation, and harm to business interests, in an amount to be proven at trial in excess of $75,000;

B.   For general damages in an amount to be proven at trial;

C.   For attorneys' fees and costs of the suit herein;

D.   For punitive damages in such amount as the Court may deem appropriate to penalize Defendants for their intentional and malicious misconduct;

E.   For prejudgment interest;

F.   For injunctive relief enjoining Defendants from further harassing Plaintiffs with such unfair and unlawful practices described herein;

G.   For declaratory relief holding that Defendants' conduct constitutes unfair competition; and

H.   For such other relief as the Court deems just and proper.

DATED: February 3, 2022             */s/ Paul A. Grammatico*

Paul A. Grammatico (SBN 246380)
pgrammatico@kcozlaw.com
**KABAT CHAPMAN & OZMER LLP**
333 S. Grand Avenue, Suite 2225
Los Angeles, California 90071
Telephone:   (213) 493-3988
Facsimile:   (404) 400-7333

Benjamin D. Williams (SBN 307073)
bwilliams@kcozlaw.com
**KABAT CHAPMAN & OZMER LLP**
171 17th Street NW, Suite 1550

Atlanta, GA 30363
Telephone:   (404) 400-7300
Facsimile:   (404) 400-7333

*Counsel for Plaintiffs Daniel S. Gladstone
and Longeviti Health, LLC*

COMPLAINT